# IN THE SUPREME COURT OF IOWA

No. 14–0944

Filed December 12, 2014

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**SETH EUGENE BALDWIN,**

Respondent.

_____

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

Grievance commission reports respondent committed numerous violations of the rules of professional conduct and recommends suspension. **LICENSE SUSPENDED.**

Charles L. Harrington and Wendell J. Harms, Des Moines, for complainant.

Seth E. Baldwin, Shenandoah, pro se.

**ZAGER, Justice.**

The Iowa Supreme Court Attorney Disciplinary Board charged attorney Seth E. Baldwin with violations of numerous Iowa Rules of Professional Conduct in his representation of Candace Johnson (Candace) in several matters. After a hearing, a division of the Grievance Commission of the Supreme Court of Iowa found Baldwin violated a number of our rules of professional conduct. The commission recommended we suspend Baldwin's license indefinitely with no possibility of reinstatement for at least six months. It also recommended that we require him to retake and pass the Multistate Professional Responsibility Exam as a condition of reinstatement, that we order him to immediately return all records and files to Candace, and that we order him to pay restitution for all attorney fees assessed against her in her modification action. Upon our de novo review, we concur in most of the findings of rule violations, but conclude that a three-month suspension is appropriate.

## I. Background Facts and Proceedings.

Baldwin was admitted to practice law in Iowa in 2006. From 2009 to 2012, Baldwin represented Candace in several matters that form the basis of the Board's complaint. These matters included: a dissolution of marriage action between Candace and her former spouse, Randy Johnson (Randy); a subsequent action to modify the decree; a domestic abuse action; a criminal case; and briefly, two child-in-need-of-assistance (CINA) cases concerning Candace and Randy's minor children, T.J. and A.J.

Baldwin's representation of Candace began in July 2009, when he was hired to represent her in a dissolution of marriage action filed by Randy. In July 2010, the district court entered a stipulated decree of

dissolution of marriage. The decree provided, in part, that the parties have joint legal custody, with shared physical care, of the minor children.

Initially, the shared physical care arrangement worked well. However, over time Candace grew concerned with Randy's behavior, which in her view became threatening towards her and the children. In response to these concerns, on May 9, 2011, Candace filed a petition for relief from domestic abuse against Randy in which she asserted that Randy had been threatening her, the children, and her friends, and that she was concerned for their safety. In her petition, Candace requested the court order Randy to stay away from her home and work; order him not to contact her by any means; and give her temporary primary care of the children, with appropriate visitation for Randy. That same day, the district court entered a temporary protective order in her favor, requiring that Randy stay away from her, that he not try to contact her by any means, and that she have custody of the children pursuant to the terms established in the 2010 dissolution decree. The order further set a hearing for May 23, to decide if a final protective order should be entered.

On May 10, Candace met with Baldwin to discuss the problems she was having with the present shared physical care arrangement. Baldwin suggested they seek to modify the 2010 dissolution decree and seek primary physical care of the children. Candace expressed that her ultimate goal was not to deprive Randy of the ability to spend time with the children, but rather to stop his troubling behavior so that the shared physical care arrangement could proceed amicably. Based on Baldwin's advice, Candace hired Baldwin to represent her in an action to modify the 2010 dissolution decree, and she and Baldwin entered into a written fee agreement concerning the matter.

The fee agreement provided that Baldwin would charge Candace a flat fee of $2500 for the modification action. Under the agreement, the first $1250 would be earned by Baldwin when Baldwin filed a petition or answer in the matter. The remaining fee of $1250 would be earned upon the entry of the final decree or order, or when the action was otherwise completed or dismissed. The agreement further provided that if the action was substantially uncontested, the fee would be reduced to $1500. Candace would be responsible for related expenses, and she was to advance the sum of $250 to Baldwin for these potential future expenses. Finally, the agreement provided that if Candace dismissed the action before its completion, she would be charged at an hourly rate of $150 for all services rendered.

On May 16, rather than filing a petition for modification, Baldwin filed an application for emergency temporary order in the district court, asking that the court temporarily modify custody so that Candace would have sole primary care of the minor children. That same day, the district court scheduled a hearing on the application for May 23.

On May 20, Baldwin entered his appearance in the domestic abuse action. Baldwin, believing the domestic abuse action to be directly related to the modification action, performed this work under the modification agreement. The two did not enter into a new fee agreement.

That same day, counsel for Randy, Joseph Nugent, filed a motion to dismiss the application for emergency temporary order. He asserted that such an application was inappropriate and that the district court was without authority to enter a temporary order modifying physical care when neither party had yet filed a petition to modify the dissolution decree.

On May 23, the day of the hearing on the application for emergency temporary order, Nugent filed an amended motion to dismiss the application. Nugent reasserted his prior position on the dismissal and asserted an additional ground for dismissal, namely that the application failed to comply with Iowa Rule of Civil Procedure 1.413(3)[1] because it did not contain an affidavit "of the person or persons knowing the facts requisite to such relief." Baldwin quickly filed an affidavit in support of the application for emergency temporary order, wherein Candace attested to the facts underlying the application.

The hearing proceeded as scheduled. Despite the fact that neither party had yet filed a petition to modify the dissolution decree—usually a prerequisite to obtaining an emergency temporary custodial order—the district court reached the merits on the assumption that one of the parties would file a petition to modify soon thereafter. On the merits, the court denied the application, noting, in reference to the pending domestic abuse action, "this matter is probably more appropriately going to be taken up on the permanent protective order issue."[2]

Also on May 23, Nugent filed a petition to modify the 2010 dissolution decree. In the petition, Nugent requested the court grant Randy primary physical care of the minor children. On June 23, Baldwin filed an answer to the petition to modify and additionally filed a

---

[1]In relevant part, Iowa Rule of Civil Procedure 1.413(3) provides:

Any motion asserting facts as the basis of the order it seeks, and any pleading seeking interlocutory relief, shall contain or be accompanied by an affidavit of the person or persons knowing the facts requisite to such relief.

[2]The hearing to determine whether a final protective order be entered, originally also scheduled for May 23, had previously been rescheduled for a later date.

cross-petition to modify the 2010 dissolution decree, requesting the court grant Candace primary physical care of the minor children.

On July 7, the district court filed its amended protective order in the domestic abuse action. As part of its order, the court extended its prior order requiring Randy to stay away from Candace and not try to contact her by any means. However, the district court continued the shared physical care arrangement for the children pursuant to the 2010 dissolution decree.

In early August, Candace was charged with possession of drug paraphernalia, in violation of Iowa Code section 124.414. *See* Iowa Code § 124.414 (2011). Candace and Baldwin met to discuss the charge, and Baldwin agreed to represent Candace. The two entered into a second fee agreement whereby Baldwin would charge Candace a flat fee of $500. Under the agreement, the first $250 would be earned by Baldwin when Baldwin filed an appearance, or a written arraignment and not guilty plea. The remaining $250 would be earned when the action was completed or dismissed. The agreement also provided that Candace would be responsible for all related expenses.

On October 12, the Montgomery County Attorney filed two CINA petitions concerning the minor children, T.J. and A.J. The petitions were based on an assessment conducted by the Iowa Department of Human Services (DHS) in which DHS alleged Candace was engaged in drug dealing and drug use in her home while her children were present. The petitions further alleged that T.J. and A.J. were likely to suffer mental injury as a result of Candace's conduct and that Candace had failed to exercise a reasonable degree of care in supervising the children, making

them children in need of assistance under Iowa Code section 232.2(6)(*c*)(1) and (2).[3]

On October 27, the juvenile court held an adjudicatory hearing in the CINA cases. Baldwin briefly attended the hearing and offered two affidavits in support of Candace, each claiming that she had not been in possession of drug paraphernalia in August 2011 and that her children were not children in need of assistance. Baldwin then told the juvenile court he would not be representing Candace in the CINA proceedings, which came as a surprise to Candace. Baldwin then left the hearing, and the juvenile court appointed another attorney to represent Candace in the CINA cases.

As part of the modification proceedings, Baldwin wanted to learn the identity of the person or persons who had alerted law enforcement and DHS to suspected drug activity by Candace. On October 28, Baldwin issued two subpoenas duces tecum, one to the sheriff and one to DHS, each prepared under the dissolution of marriage caption and case number. Each subpoena commanded the production of information regarding the identity of and statements made by any and all informants against Candace regarding allegations of any type of suspected wrongdoing over the past five years. This information was to be

---

[3]In relevant part, Iowa Code section 232.2(6)(*c*)(1) and (2) provides:

> 6. "*Child in need of assistance*" means an unmarried child:
>
> . . . .
>
> *c.* [W]ho has suffered or is imminently likely to suffer harmful effects as a result of . . .
>
> (1) Mental injury caused by the acts of the child's parent . . . [or]
>
> (2) The failure of the child's parent . . . to exercise a reasonable degree of care in supervising the child.

produced by November 10. Iowa Rule of Civil Procedure 1.305(13)[4] discusses service of process on a state agency, and Iowa Rule of Civil Procedure 1.1701(3)(*a*)[5] discusses notice of service of process on interested parties. Baldwin complied with neither of these rules as he had the DHS subpoena served on an employee working in the local DHS office, and he did not serve a notice of these subpoenas on either Randy or Nugent.

On November 8, the juvenile court filed an adjudicatory order in the CINA cases. Based on a report that numerous drug paraphernalia items had been confiscated from Candace's residence, the juvenile court concluded that T.J. and A.J. were children in need of assistance and placed the children in the care, custody, and control of Randy, subject to DHS supervision. It also authorized Candace to visit the children as arranged and approved by DHS. The juvenile court further granted a motion for concurrent jurisdiction previously filed by Randy, which allowed the modification action to proceed. Also on this date, the district court dismissed the paraphernalia charge against Candace, noting that

---

[4]In relevant part, Iowa Rule of Civil Procedure 1.305(13) provides:

Original notices are "served" by delivering a copy to the proper person. Personal service may be made as follows:

. . . .

**1.305(13)** Upon a governmental board, commission or agency, *by serving its presiding officer, clerk or secretary.*

(Emphasis added.)

[5]In relevant part, Iowa Rule of Civil Procedure 1.1701(3)(*a*) provides:

Any person who is at least 18 years old and not a party may serve a subpoena. . . . *If the subpoena commands the production of documents,* [or] *electronically stored information . . . then before it is served, a notice must be served on each party.*

(Emphasis added.)

the State acknowledged the alleged paraphernalia may have belonged to someone other than Candace.

Based on the grant of concurrent jurisdiction, a scheduling conference was held in the modification action on November 28. Baldwin participated in this scheduling conference on behalf of Candace. At the scheduling conference, the district court scheduled a two-day trial to begin on May 3, 2012, and established April 26, 2012, as the deadline for the parties to file their respective witness and exhibit lists.

On December 8, the juvenile court held a dispositional hearing in the CINA cases. On December 20, the juvenile court filed its order which continued the CINA proceedings and the placement of T.J. and A.J. in the care, custody, and control of Randy. The order also allowed Candace to continue visiting the children as arranged and approved by DHS.

By the middle of April, neither the sheriff nor DHS had complied with the subpoenas duces tecum previously issued by Baldwin. Therefore, on April 20, Baldwin filed two motions to compel compliance with those subpoenas. Neither motion was served on any party or counsel, and neither motion contained certificates of service, despite the requirements of Iowa Rule of Civil Procedure 1.442.[6] The district court granted the motions to compel that same day, ex parte.

---

[6]In relevant part, Iowa Rule of Civil Procedure 1.442 provides:

**1.442(1)** *When service is required.* Unless the court otherwise orders, . . . every written motion including one which may be heard ex parte . . . shall be served upon each of the parties. . . .

**1.442(2)** *How service is made.* Service upon a party represented by an attorney shall be made upon the attorney unless service upon the party is ordered by the court . . .

. . . .

**1.442(7)** *Certificate of service.* All papers required or permitted to be served or filed shall include a certificate of service.

On April 26, Nugent filed a motion to quash the subpoenas duces tecum previously issued to the sheriff and DHS. Nugent alleged that Baldwin had not complied with Iowa Rule of Civil Procedure 1.1701(3)(*a*), which requires service of notice of these subpoenas on Nugent. Nugent also filed a motion in limine to prevent the use of any documents or presentation of any testimony regarding documents obtained through the improperly issued subpoenas.

On April 27, six days prior to the scheduled start of the modification trial, and after the deadline to exchange witness and exhibit lists, Candace met with Baldwin to prepare for trial and to deliver documents to Baldwin. At this meeting, Baldwin and Candace discussed the testimony and evidence to be presented at trial. Baldwin assured Candace that a number of experts would be testifying on her behalf.

On April 30, DHS filed a motion resisting the motion to compel, requesting the district court reconsider the April 20 order to compel, and requesting that it quash the subpoena duces tecum. This motion alleged that Baldwin had failed to have DHS properly served pursuant to Iowa Rule of Civil Procedure 1.305(13). The motion further asserted that DHS was prohibited from disclosing the information requested in the subpoena duces tecum by Iowa Code section 232.71B(2),[7] which protects informants in CINA cases. Finally, the motion alleged that the district

---

[7]In relevant part, Iowa Code § 232.71B(2) provides:

> The department, within five working days of commencing the assessment, shall provide written notification of the assessment to the child's parents. . . . *The parents shall be informed in a manner that protects the confidentiality rights of an individual who reported the child abuse or provided information as part of the assessment process.*

(Emphasis added.)

court had erroneously granted the motion to compel without providing DHS an opportunity to be heard.

On April 30, the district court held a hearing on the various motions regarding the improperly issued subpoenas. On May 1, the district court filed its order granting the various motions. In its order, the court found that neither Randy nor Nugent received a service copy of the subpoenas issued to the sheriff or DHS. The court also found that service of the subpoena on a DHS employee working in the local DHS office was not proper service pursuant to rule 1.305(13) and that the subpoena served on DHS sought information which DHS is prohibited from releasing under Iowa Code section 232.71B(2). Accordingly, the district court vacated its April 20 order, quashed the subpoenas issued to the sheriff and DHS, granted Nugent's motion in limine, and awarded Randy attorney fees for his motion to quash subpoena, which totaled $1260.40.

On May 2, Baldwin prepared witness and exhibit lists for the modification trial, which he purportedly faxed to Nugent that same day. On May 3, the day of the modification trial, Nugent advised the district court that he had not received Baldwin's witness or exhibit lists. Accordingly, Nugent filed a motion in limine to prevent Candace from presenting any documents or witness testimony due to the failure to comply with the April 26 disclosure deadline. Baldwin told the court that he had sent these lists to Nugent, but failed to bring them with him to court. After hearing arguments of counsel, the district court found that Candace had failed to timely provide her witness or exhibit lists. The court gave Candace the option of either having the motion in limine granted and proceeding to trial as scheduled, or having the trial continued with the court ordering her to pay all of Randy's costs and

attorney fees. Candace chose to have the trial continued. The court rescheduled the trial for August 16, ordered Candace to pay Randy's attorney fees and expenses totaling $1874.90, and ordered Candace to have her witness and exhibit lists submitted by May 9.

Sometime between May 4 and May 7, Candace decided to discharge Baldwin as her attorney and stopped payment on a check she had written to Baldwin on May 2. In this time period, Candace spoke with Baldwin and told him that she would be discharging him and that she had stopped payment on the May 2 check. The check did not clear her account.

On May 7, Baldwin filed the witness and exhibit lists in the modification action. Candace was not pleased with the witnesses on the list and believed there were at least five witnesses who were more critical to her case. Candace further believed that Baldwin had omitted persuasive exhibits from the list.

Between the end of May and early June, Candace hired attorney Larry Melcher to represent her in the modification action, and on June 4, Melcher filed his appearance on her behalf. On June 11, Baldwin withdrew from representation in the modification action.

At that time, Baldwin believed that Candace owed him additional fees for services he had performed in her modification action. He asserted a retaining lien against her files and records and refused to relinquish them to her despite requests from both Candace and Melcher that he do so. On June 20, Baldwin wrote to Candace regarding her May 2 check. In his letter, Baldwin asserted Candace still owned him $1550 ($1540, plus $10 for service costs) in attorney fees. He also advised her that her failure to pay him constituted a willful theft of services under Iowa law, and that if Candace did not pay within ten days of her receipt

of the letter, the matter would be forwarded to the Page County Magistrate for further action.

On July 5, Melcher responded to Baldwin and demanded that Baldwin return the files and records to Candace and deliver an itemized billing statement to his office within 10 days. On July 6, Baldwin responded to Melcher and reasserted his position that the failure to pay amounted to criminal conduct and promised to provide Candace with an itemized bill. Baldwin never returned the files or records, nor did he ever provide Candace or Melcher with an itemized billing statement.

While the dispute regarding the file and fees was occurring, the juvenile court held a review hearing regarding the minor children. On June 28, the juvenile court entered an order which continued the CINA proceedings. Significantly, the juvenile court returned custody of the children to the parents on their original shared physical care arrangement. In a second significant development, the juvenile court revoked concurrent jurisdiction in the district court.

On July 11, Nugent filed a motion in the modification action asking that the district court vacate the order to revoke concurrent jurisdiction. The district court denied that motion and stayed the modification action. By October, both Randy and Candace had filed dismissals of their respective petitions to modify the dissolution decree. Also in October, the juvenile court closed the CINA cases, noting that the permanency goal of shared physical care had been achieved.

In addition to the substantive matters set forth above, this case also involves both Baldwin's management of his trust account and his protection of Candace's interests. As noted above, the record established that Baldwin and Candace entered into two fee agreements. Under each agreement, a portion of Baldwin's fee would be earned when certain

milestones were achieved. Because the details regarding payments, withdrawals, and the earning of the fees are intertwined with the respective legal arguments, we will elaborate on these facts later within our analysis section. However, several general observations can be made: first, Baldwin always deposited all funds received from Candace into the trust account; second, when Baldwin withdrew fees from the trust account, he never provided Candace with a contemporaneous written notice of such withdrawals, or a contemporaneous written accounting. The record reflects that this occurred on seven separate occasions.

On these facts, the Board filed a complaint against Baldwin which alleged numerous violations of our Iowa Rules of Professional Conduct and numerous violations of our Iowa Court Rules. Of note, Baldwin's deadline to file an answer with the Board regarding the complaint was January 20, 2014. On January 24, four days after the deadline, Baldwin filed an application for an extension to file his answer. His answer was ultimately filed on February 13.

In March 2014, an evidentiary hearing was held before the commission. After the hearing, the commission found Baldwin violated all of the rules alleged by the Board and recommended, among other things, that we suspend Baldwin's license indefinitely with no possibility of reinstatement for at least six months.

## II. Standard of Review.

Our review of attorney disciplinary proceedings is de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Conroy*, 845 N.W.2d 59, 63 (Iowa 2014). The Board must prove attorney misconduct by a convincing preponderance of the evidence, a burden greater than a preponderance of the evidence but less than proof beyond a reasonable doubt. *Iowa*

*Supreme Ct. Att'y Disciplinary Bd. v. Thomas*, 844 N.W.2d 111, 113 (Iowa 2014). We give the commission's findings and recommendations respectful consideration, but we are not bound by them. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ricklefs*, 844 N.W.2d 689, 696 (Iowa 2014). "We deem factual matters admitted by an attorney in an answer as established, regardless of the evidence in the record." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Stowe*, 830 N.W.2d 737, 739 (Iowa 2013). "Upon proof of misconduct, we may impose a greater or lesser sanction than the sanction recommended by the commission." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Templeton*, 784 N.W.2d 761, 764 (Iowa 2010).

### III. Review of Alleged Ethical Violations.

As part of its amended complaint, the Board has alleged numerous violations of the Iowa Rules of Professional Conduct and the Iowa Court Rules. We turn now to consider the alleged individual rule violations.

**A. Competence and Diligence.** Rule 32:1.1 provides: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." Iowa R. Prof'l Conduct 32:1.1.

> "To establish an attorney has violated rule 32:1.1, the [B]oard must prove the attorney did not possess the requisite legal knowledge and skill to handle the case or that the attorney did not make a competent analysis of the factual and legal elements of the matter."

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kennedy*, 837 N.W.2d 659, 668 (Iowa 2013) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Thomas*, 794 N.W.2d 290, 293 n.2 (Iowa 2011)).

In assessing competency violations, we distinguish between instances in which the record establishes only neglect and instances in

which the record demonstrates a "*substantive* lack of competence on a factual or legal element." *Id.*; *see also Conroy*, 845 N.W.2d at 64 ("In . . . *Kennedy,* we were careful to point out that mere neglect of client matters does not establish a lack of competence."). However, we have also recognized that " '[c]ompetent handling of a particular matter includes . . . use of methods and procedures meeting the standards of competent practitioners.' " *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Tompkins*, 733 N.W.2d 661, 668 (Iowa 2007) (alteration in original) (quoting Iowa R. Prof'l Conduct 32:1.1 cmt. 5).

Turning to the facts of this case, the Board first asserts that Baldwin's approach of seeking an emergency temporary order in order to facilitate a change in physical care amounted to incompetence because it was unlikely to succeed. The commission rejected this argument, and we agree with the commission that Baldwin's decision to seek a temporary change in physical care by this method does not rise to the level of incompetence.

Instead of immediately filing a modification petition, Baldwin filed an application for emergency temporary order in the district court. We have previously recognized that a district court has the authority to enter temporary reassignment of custodial responsibilities upon a proper showing of necessity. *See In re Marriage of Grantham,* 698 N.W.2d 140, 146 (Iowa 2005) (holding that district court did not act outside of its authority in granting a temporary change in custody where father's "military service necessitated that a temporary reassignment of custodial responsibilities be made without delay"). Here, Candace was concerned that Randy's behavior posed an immediate threat to her and her children. Baldwin sought to remedy that situation by making application for an emergency temporary order. We do not conclude that simply

because this avenue was unlikely to succeed that this demonstrates Baldwin did not possess the requisite legal knowledge and skill to handle the case, or that he did not make a competent analysis of the factual and legal elements of the matter.

While the commission concluded that this did not rise to the level of incompetence, the commission concluded that Baldwin's repeated failure to comply with our rules of civil procedure and a court ordered deadline did. While a conclusion on this basis is a close one, we disagree with the commission on this point.

The record established by a convincing preponderance of the evidence that Baldwin failed to comply with a number of our rules of civil procedure and a court ordered deadline in his representation of Candace. First, in seeking an emergency temporary order, Baldwin failed to comply with rule 1.413(3) by failing to attach an affidavit as required. *See* Iowa R. Civ. P. 1.413(3). Second, Baldwin improperly served a subpoena duces tecum on DHS by serving it on a DHS employee working in the local DHS office, as opposed to a "presiding officer, clerk or secretary" as required by rule 1.305(13). *Id.* r. 1.305(13). Moreover, the subpoena duces tecum Baldwin served on DHS sought information protected by statute. *See* Iowa Code § 232.71B(2). Third, Baldwin failed to provide notice of service of these subpoenas to Randy or Nugent, despite the clear requirement of rule 1.1701(3)(a). *See* Iowa R. Civ. P. 1.1701(3)(*a*). Fourth, despite the host of deficiencies surrounding the issuance of these subpoenas, Baldwin then sought to compel compliance with them by filing motions to compel and in so doing failed to serve these motions on Randy or Nugent. *See id.* r. 1.442(1)–(2). He also failed to attach the requisite accompanying certificates of service to these motions. *See id.* r.

1.442(7). Finally, Baldwin failed to file the witness and exhibit lists by the April 26 deadline, resulting in the delay of the modification trial.

While this myriad of procedural violations is certainly inexcusable, we do not think it shows that Baldwin lacked the skill and knowledge to handle the case. Rather, these failures speak more to his pattern of neglect in his representation of Candace than to his substantive lack of competence on a factual or legal element. Accordingly, we conclude that Baldwin did not violate rule 32:1.1.

Closely related, rule 32:1.3 provides: "A lawyer shall act with reasonable diligence and promptness in representing a client." Iowa R. Prof'l Conduct 32:1.3. "A violation of this rule arises not from inadvertent acts or omissions or from missing a single deadline, but from consistently failing to perform functions required of an attorney or from repeatedly missing deadlines." *Conroy*, 845 N.W.2d at 64; *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. McCarthy*, 814 N.W.2d 596, 605–06 (Iowa 2012) (finding rule 32:1.3 violation where attorney failed to timely file numerous petitions and interrogatory answers, failed to comply with an order "directing him to cure deficient filings," and "failed to appear at a pretrial conference and a hearing"); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Humphrey*, 812 N.W.2d 659, 662–65 (Iowa 2012) (finding rule 32:1.3 violation where "only action [attorney] took to represent his clients was to send two letters to [a] claim adjuster" and where he failed to respond to repeated calls, text messages, and letters from his clients).

As set forth above, our de novo review of the record confirms that Baldwin consistently failed to diligently represent Candace in matters involving custody of the minor children. With respect to the application for emergency temporary order, Baldwin failed to attach an affidavit in support of the facts underlying the application as required by the rules of

civil procedure. After the CINA cases were commenced, Baldwin did not enter an appearance on behalf of Candace and failed to represent her in critical juvenile court proceedings involving the temporary physical placement of her children. While Baldwin submitted two affidavits at the initial CINA hearing, he then told the juvenile court he would not be representing Candace and left the proceeding, which came as a surprise to Candace. As a result, the children were placed in Randy's care.

In the modification action, Baldwin neglected to properly serve the subpoenas deuces tecum on the sheriff or DHS, and neglected to provide proper notices to Randy or Nugent regarding the subpoenas. Baldwin then neglected to follow up on these subpoenas until two weeks before trial, after no documents had been forthcoming for many months. When he finally did follow up by filing two motions to compel, he failed to serve the motions on Randy or Nugent and failed to attach the requisite certificates of service to the motions. Even had the subpoenas been properly issued, Baldwin's delayed pursuit of any responses and his subsequent failure to comply with the rules of civil procedure rendered him unable to cure the improper service and defective notice surrounding the subpoenas in time to obtain information relevant to the modification action. This clearly impaired his ability to meaningfully prepare for trial and resulted in the imposition of attorney fees against Candace, totaling $1260.40.

As a final act demonstrating a lack of diligence, Baldwin failed to meet the witness and exhibit list deadline set many months before. In fact, it is questionable whether Baldwin ever provided a witness or exhibit list to Nugent, even on the morning of the original modification trial. This dilatory conduct resulted in the continuance of the trial and

lead to a further assessment of attorney fees against Candace, this time totaling $1874.90.

Given this compilation of conduct, we find that Baldwin failed to act with reasonable diligence in his representation of Candace in violation of rule 32:1.3.

**B. Retaining Lien.** In relevant part, rule 32:1.15(d) provides:

> Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

Iowa R. Prof'l Conduct 32:1.15(d).

> Rule 32:1.16(d) provides:

> Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled, and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers relating to the client to the extent permitted by law.

*Id.* r. 32:1.16(d).

The Board alleged that Baldwin violated these rules by failing to return Candace's files and records after she terminated his representation. Baldwin argues that he had a valid retaining lien against the files and records pursuant to Iowa Code section 602.10116.[8]

---

[8]In relevant part, Iowa Code section 602.10116 provides:

> An attorney has a lien for a general balance of compensation upon:

> 1. Any papers belonging to a client which have come into the attorney's hands in the course of professional employment.

> 2. Money in the attorney's hands belonging to a client.

According to Baldwin, he was justified in refusing to relinquish the files and records because Candace owed him fees for services rendered in his representation of her.

The Board's argument in response to Baldwin is twofold. First, the Board argues that at the time Baldwin asserted his retaining lien on the files and records he had no claim to any additional fees owed him by Candace, such that he could assert a valid retaining lien against her files and records. Second, the Board argues that, regardless of whether Candace owed Baldwin money for services rendered, Baldwin subsequently failed to take action to properly preserve his lien by failing to comply with Iowa Code section 602.10118.[9]

Thus, we must first determine whether Candace owed Baldwin for legal services at the time she terminated his representation. And second, if she did, whether Baldwin failed to take proper action to preserve his lien after Candace demanded an accounting. Because we find that Candace did not owe Baldwin for legal services at the time she terminated his representation, we need not address the Board's alternative argument that Baldwin failed to preserve his lien after Candace demanded he provide an accounting.[10]

Baldwin entered into two agreements with Candace: the first, for his representation of her in the modification action; the second, for his representation of her in the criminal case. Based on the record, it is

---

[9]Iowa Code section 602.10118 provides:

Such lien will be released, unless the attorney, within ten days after demand therefor, files with the clerk a full and complete bill of particulars of the services and amount claimed for each item, or written contract with the party for whom the services were rendered.

[10]The record discloses that Baldwin never provided the accounting requested by Candace or her new attorney.

clear there is no fee dispute surrounding the criminal case. We thus look to the fee agreement covering the modification action, and the corresponding payments and fees earned.

Under the terms of the modification agreement, Baldwin charged Candace a flat fee of $2500. The contract established two milestones. At each milestone, Baldwin would be deemed to have earned a portion of his fee. The first $1250 would be earned by Baldwin when he filed a petition or answer in the matter. The remaining $1250 would be earned upon the entry of the final decree or order, or when the action was otherwise completed or dismissed. Candace was also required to pay related expenses, and the agreement further provided that if Candace dismissed the action before its completion, she would be charged at an hourly rate of $150 for all services rendered.

The record established that on May 10, 2011, when the two first met to discuss the modification action, Candace paid Baldwin $500 towards this flat fee. On June 22, Baldwin withdrew that $500 from the trust account for services rendered and subsequently filed an answer and cross-petition. At that time, pursuant to the terms of the agreement, Baldwin had earned $1250. However, the account was deficient by $750.

Thereafter, on June 28, Baldwin transferred $10 of excess funds that Candace had paid him in an unrelated guardianship matter to the trust account for her modification action. On July 22, Candace paid Baldwin $750 for fees in the modification action. Thus, at that time the trust account balance was $760, $750 of which Baldwin had earned and not yet withdrawn. On July 27, Baldwin withdrew $760 in fees—$10 more than he had earned at that time.

On December 12, Candace paid Baldwin an additional $250 for the modification action. The account balance was now at $250—none of which Baldwin had yet earned—and $990 short of the total remaining $1240 fee then still owed. On March 7, 2012, Baldwin withdrew $42 from the trust account for subpoena related expenses. This was a proper withdrawal as under the contract Candace was responsible for expenses. The account was then $1032 short in future fees and had a balance of $208, none of which Baldwin had earned. On April 26, Baldwin withdrew the remaining $208 from the trust account, making no claim that this was an expense-related withdrawal. At that time, no final decree or order had been entered, and the action had not otherwise been completed or dismissed. Thus, Baldwin had not yet earned this $208 under the agreement. At that time, Candace owed Baldwin $1032 in future fees, assuming Baldwin completed his work under the agreement.

On May 2, Baldwin asked that Candace pay him $1540. Baldwin testified at the hearing before the commission that this amount was overstated by approximately $500 due to an accounting error and that Candace actually owed him $1042 in fees at that time. At the time of the hearing, Baldwin's assessment that Candace owed him $1042 was premised on his understanding that the previous $10 transfer of excess funds from the unrelated guardianship matter was a "gift" from Candace. Yet, the record revealed that Candace was not even aware of this transfer. Thus, at the time Baldwin asked Candace to pay him $1540, Candace only owed Baldwin $1032 under the agreement. Baldwin had not yet earned the final $1250 under the agreement. Thereafter, Candace discharged Baldwin as her attorney.

Baldwin argues that he had earned more than $1250 in fees at the time Candace terminated his representation and therefore had more than

earned the $218 in excess funds taken from the trust account. Baldwin now asks that he be allowed to be paid on an hourly basis for the services he provided Candace between the time he filed her answer and cross-petition, and the time she terminated him. However, Baldwin has never provided any time records or an itemized statement in support of this claim, either to Candace or as part of these proceedings. This claim is without merit.

After Baldwin was terminated, he did not have a valid claim to any additional fees and therefore could not properly assert a valid retaining lien against Candace's files and records under Iowa Code section 602.10116. Without a valid lien, Baldwin improperly held her files and records for a period of several months despite repeated requests from Candace and counsel that he return them to her possession. Baldwin withheld the files and records while fully aware that the trial, delayed as a result of his own conduct, was quickly approaching. We find that Baldwin's failure to promptly return the files and records to Candace violated rule 32:1.15(d). *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Earley* (*Earley II*), 774 N.W.2d 301, 307 (Iowa 2009) (finding rule 32:1.15(d) violation where attorney refused to return client files upon request). We also find that this conduct violated rule 32:1.16(d). The record shows by a convincing preponderance of the evidence that with or without a valid retaining lien, Baldwin failed to take reasonable steps to protect Candace and her interests by surrendering her files and records to assist her new counsel in preparing for her upcoming trial. *See* Iowa R. Prof'l Conduct 32:1.16(d).

Additionally, we find that Baldwin violated these same rules by withdrawing funds he had not yet earned from the trust account and failing to subsequently return these funds to Candace. *See Iowa*

*Supreme Ct. Att'y Disciplinary Bd. v. Parrish*, 801 N.W.2d 580, 586–87 (Iowa 2011) (finding rule 32:1.15(d) and 32:1.16(d) violations where attorney failed to return unearned retainer). Baldwin has not yet returned these funds to Candace, and they remain her property.[11] *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Apland*, 577 N.W.2d 50, 55 (Iowa 1998) (holding flat fees are nothing more than an advance fee payment and that these "[f]unds remain the property of the client until the attorney earns them"). While Baldwin now attempts to justify these fees, he has never accounted for them. In addition, Baldwin further violated rule 32:1.15(d) after his representation of Candace ended by failing to provide her with an itemized bill, or any sort of accounting, despite repeated requests that he do so.

**C. Mishandling of Client Funds.** The Board alleges that Baldwin violated rules 32:1.15(c) and (f) and Iowa Court Rules 45.7(3), 45.7(4) and 45.10(3). We address these alleged rule violations together because they all apply to the handling of client funds.

In relevant part, rule 32:1.15 provides:

> (c) A lawyer shall deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred.
>
> . . . .

---

[11]Although we find Baldwin has not yet returned these funds to Candace, we do not find this conduct amounts to misappropriation. Here, the record establishes that Baldwin had a colorable future claim to these funds. *Compare Iowa Supreme Ct. Att'y Disciplinary Bd. v. Adams*, 809 N.W.2d 543, 545–46 (Iowa 2012) (finding misappropriation where attorney took client funds to which he had no colorable future claim and used the money for his own purposes), *with Parrish*, 801 N.W.2d at 586–88 (finding no misappropriation under advanced fee agreements despite attorney's failure to return unearned client funds upon termination of representation). Rather, the record established that at the time Baldwin overdrew the trust account, he could have reasonably expected to represent Candace to the conclusion of the modification action and thereby earn those fees under the agreement.

(f) All client trust accounts shall be governed by chapter 45 of the Iowa Court Rules.

Iowa R. Prof'l Conduct 32:1.15(c), (f).

As it relates to the alleged violation of Iowa Court Rules, we have previously explained,

> Iowa Court Rules 45.1, 45.2(2), 45.3, 45.4, and 45.7 generally set forth the details a lawyer needs to know and follow when administering his or her trust accounts. These rules generally require a lawyer to place client funds into a separate subaccount, withdraw payment from the trust account only once the fee is earned, notify the client when the attorney anticipates making a fee withdrawal, and provide the client a complete accounting of any such withdrawal. The attorney must also transmit the notice of such withdrawal and accounting no later than the date of withdrawal.

*Parrish*, 801 N.W.2d at 586; *see also* Iowa Ct. R. 45.10 (governing flat fee agreements). From our de novo review of the record, we find that Baldwin has violated several ethical rules governing the management of client trust accounts.

First, we find that Baldwin violated rules 32:1.15(c) and (f), and rules 45.7(3) and 45.10(3) by withdrawing funds from the trust account before these fees were earned. Iowa R. Prof'l Conduct 32:1.15(c) (withdrawing fees only as earned); Iowa R. Prof'l Conduct 32:1.15(f) (incorporating chapter 45 of the Iowa Court Rules); Iowa Ct. R. 45.7(3) (withdrawing fees only as earned); Iowa Ct. R. 45.10(3) (same). In the criminal case, the record established that Baldwin prematurely withdrew funds from the trust account that he had not yet earned when he took the final fee before the criminal case was dismissed. Similarly, in the modification action, Baldwin withdrew $218 in fees from the trust account that he had not yet earned. Thus, Baldwin violated these rules.

Second, we find that Baldwin violated rules 32:1.15(f) and 45.7(4), which require attorneys to notify their clients in writing and provide a contemporaneous accounting when the attorney withdraws fees from the trust account. Iowa Ct. R. 45.7(4) (notifying clients upon withdrawal of fees or expenses); Iowa R. Prof'l Conduct 32:1.15(f) (incorporating chapter 45 of the Iowa Court Rules). Here, Baldwin admitted in his answer that he failed to provide Candace with written notices and accountings when he withdrew fees and expenses on seven separate occasions. There is clear evidence in the record to support these violations.

**D. Compliance with the Rules of a Tribunal.** Rule 32:3.4(c) prohibits an attorney from "knowingly disobey[ing] an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists." Iowa R. Prof'l Conduct 32:3.4(c). The basic proposition of this rule is "simply that court orders and court rules must be obeyed until such time as they are successfully challenged." 2 Geoffrey C. Hazard, Jr. et al., *The Law of Lawyering* § 30.7, at 30-17 (3d ed. 2011 Supp.). This includes compliance with our rules of civil procedure and orders in a specific case. *Id*; *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kieffer-Garrison*, 847 N.W.2d 489, 493 (Iowa 2014) (holding knowingly missing deadlines established by the rules of appellate procedure violates rule 32:3.4(c)).[12] Our decisions have also explained that an additional purpose of rule 32:3.4(c) is to ensure " '[f]air

---

[12]Other courts have found ethical violations of this same rule based on lawyers missing deadlines established in scheduling orders. *See, e.g.*, *Att'y Grievance Comm'n of Md. v. Hermina*, 842 A.2d 762, 766, 771 (Md. 2004) (finding violation of identical rule where attorney "fail[ed] to participate in [a] pretrial conference, [and thereby] knowingly disobeyed an obligation created by the scheduling order"); *In re Disciplinary Proceedings Against Bryant*, 847 N.W.2d 833, 837–38, 843 (Wis. 2014) (finding violation of identical rule where attorney failed to provide a witness list and summary report by the deadline established in the court's scheduling order).

competition in the adversary system' through proper adherence to discovery and evidence rules." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dunahoo*, 799 N.W.2d 524, 533 (Iowa 2011) (quoting Iowa R. Prof'l Conduct 32:3.4(c) cmt. 1). To violate this rule, the attorney must have actual knowledge of the court order. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Barnhill*, 847 N.W.2d 466, 484 (Iowa 2014). "If an attorney has knowledge of the court order, and yet fails to obey the court order, the attorney violates this rule." *Id.*

Here, the Board established by a convincing preponderance of the evidence that Baldwin violated rule 32:3.4(c). The record shows Baldwin participated in the trial scheduling conference wherein the witness and exhibit list deadline was established. Baldwin also participated in the establishment of the trial date. There is no doubt that Baldwin knew of the disclosure deadline and the trial date. Baldwin simply ignored the order of the court. The record also supports the conclusion that this conduct, along with the numerous failures by Baldwin to comply with our rules of civil procedure set forth earlier, undermined the competitive fairness of the proceedings and disadvantaged opposing counsel. We find that this conduct violates rule 32:3.4(c).

**E. Conduct Prejudicial to the Administration of Justice.** Rule 32:8.4(d) provides: "It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." Iowa R. Prof'l Conduct 32:8.4(d). "There is no typical form of conduct that prejudices the administration of justice." *Parrish*, 801 N.W.2d at 587. Acts that we have generally considered prejudicial to the administration of justice have "hampered the efficient and proper operation of the courts or of ancillary systems upon which the courts rely." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wright*, 758 N.W.2d 227,

230 (Iowa 2008) (internal quotation marks omitted). "Violations of this rule impede the efficient operation of the courts and waste judicial resources." *Kieffer-Garrison*, 847 N.W.2d at 495.

In this case, the record is replete with examples of conduct by Baldwin that was prejudicial to the administration of justice. Baldwin mishandled the issuance of subpoenas duces tecum, not only procedurally but substantively. He then sought to compel compliance with these subpoenas by filing motions to compel and in so doing failed to serve notice of these motions on the proper parties. Baldwin also obtained an ex parte order granting the motions to compel, which upon being discovered by Randy and DHS required the filing of motions to quash. In turn, an additional hearing was held on the matter, wasting court resources. *See Barnhill*, 847 N.W.2d at 472, 484 (finding rule 32:8.4(d) violation where attorney caused delays by failing to serve copy of assignment order on an interested party after being ordered to do so); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGinness*, 844 N.W.2d 456, 463 (Iowa 2014) (finding rule 32:8.4(d) violation where attorney caused the district court to schedule a completely unnecessary hearing).

Further, Baldwin's failure to submit witness and exhibit lists by the established deadline resulted in the filing of a motion in limine, a hearing on the motion in limine, and ultimately the rescheduling of the trial—all needless wastes of judicial resources. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Nelson*, 838 N.W.2d 528, 541 (Iowa 2013) (finding rule 32:8.4(d) violation where attorney ignored deadlines). Next, Baldwin improperly retained Candace's files and records after she terminated him, hampering her ability to adequately prepare for her rescheduled trial. *Earley II*, 774 N.W.2d at 307 (finding conduct prejudicial to the administration of justice where attorney refused to return client files

upon request). Finally, we note that Baldwin failed to timely file his answer to the Board's complaint by the answer deadline. *See Nelson,* 838 N.W.2d at 540 ("An attorney's failure to timely cooperate with disciplinary authorities is prejudicial to the administration of justice . . . ."); *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Casey,* 761 N.W.2d 53, 60 (Iowa 2009) (finding rule 32:8.4(d) violation where attorney failed to timely respond to Board inquiry); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Marks,* 759 N.W.2d 328, 331 (Iowa 2009) (finding conduct prejudicial to the administration of justice where attorney failed to timely respond to Board inquiry). We conclude that Baldwin's conduct was prejudicial to the administration of justice, in violation of rule 32:8.4(d).

## IV. Consideration of Appropriate Sanction.

The commission recommended we suspend Baldwin's license indefinitely without the possibility of reinstatement for six months and that he be required to retake and pass the Multistate Professional Responsibility Exam before being reinstated. In addition, the commission recommended we order Baldwin to immediately return to Candace all records in his possession and pay restitution for all costs for attorney fees assessed against her in her modification action. We give respectful consideration to the commission's recommendation. However, the issue of appropriate sanction is exclusively within this court's authority. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Morrison,* 727 N.W.2d 115, 119 (Iowa 2007).

"There is no standard sanction for a particular type of misconduct, and though prior cases can be instructive, we ultimately determine an appropriate sanction based on the particular circumstances of each

case." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Earley* (*Earley I*), 729 N.W.2d 437, 443 (Iowa 2007).

> In considering an appropriate sanction, this court considers all the facts and circumstances, including the nature of the violations, the attorney's fitness to practice law, deterrence, the protection of society, the need to uphold public confidence in the justice system, and the need to maintain the reputation of the bar.

*McGinness*, 844 N.W.2d at 463. This court has recognized that "[w]here there are multiple violations of our disciplinary rules, enhanced sanctions may be imposed." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Alexander*, 574 N.W.2d 322, 327 (Iowa 1998). Further, we "consider mitigating and aggravating circumstances, including companion violations, repeated neglect, and the attorney's disciplinary history." *Conroy*, 845 N.W.2d at 66.

Here we deal primarily with neglect involving a single client. "When neglect of client matters is the principal violation in an attorney disciplinary case, the resulting discipline normally ranges from a public reprimand to a six-month suspension." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Moorman*, 683 N.W.2d 549, 553 (Iowa 2004) (internal quotation marks omitted). "Neglect resulting in harm supports more serious discipline." *Id.*

In addition, Baldwin violated several of our rules regarding trust account management. When dealing with a trust account violation,

> our sanctions have ranged from a public reprimand when the violation was relatively minor and isolated, to license suspension when the violation involved poor office management and neglect, to license revocation when the violation amounted to a misappropriation of client funds.

*Parrish*, 801 N.W.2d at 588 (citations omitted). Here, we deal with multiple trust account violations with a single client stemming from poor

office management. However, there has been no showing of misappropriation of funds. Thus, we find our suspension cases most instructive. "Cases involving suspension for client trust account violations range from two months in less serious cases, to eighteen months in very severe cases when the violations combine with multiple instances of neglect and other ethical violations." *Id.* at 588–89 (citations omitted).

Additionally, Baldwin violated several other rules of professional conduct. Baldwin improperly withheld client files and records in violation of our rules governing the return of client property. Baldwin also failed to meet deadlines in violation of our rules governing compliance with the rules of a tribunal and conduct prejudicial to the administration of justice. We consider these violations as well in crafting the appropriate sanction.

In *Iowa Supreme Court Board of Professional Ethics & Conduct v. Plumb*, we suspended an attorney's license for two months for conduct similar to that found here. 589 N.W.2d 746, 747–49 (Iowa 1999). There, the attorney failed to further the interest of his client by ineffectively publishing notices in newspapers, by failing to continue the pursuit of that action after the court ruled his notices ineffective, by failing to file a petition to terminate his client's husband's parental rights, and by failing to file a personal bankruptcy petition at his client's request. *Id.* at 747. Then, he failed to return his client's file after she terminated his representation and obtained new representation. *Id.* Additionally, he mishandled client fees and had received two prior public reprimands. *Id.* at 749. In *Iowa Supreme Court Attorney Disciplinary Board v. Ireland*, we suspended an attorney's license for six months when he agreed to close a client's estate and thereafter failed to take any action on the matter,

failed to notify his client that he was closing his law office, failed to return personal papers and funds, and failed to provide accountings. 748 N.W.2d 498, 500, 503 (Iowa 2008) (per curiam). The attorney had previously received a prior admonition from the Board and a public reprimand. *Id.* at 503.

Here we have an attorney who neglected a single client matter, compounded this neglect by failing to meet deadlines, failing to comply with the rules of civil procedure leading to unnecessary court and client expenses, improperly refusing to return client files and records after representation was terminated, and mishandling client fees. Accordingly, we find these cases instructive in determining the proper sanction.

Additionally, we must consider aggravating and mitigating factors in crafting the proper punishment. *Conroy*, 845 N.W.2d at 66. "The prior disciplinary history of an attorney is one factor we must consider." *Parrish*, 801 N.W.2d at 589. In so doing, we consider both prior admonitions and prior public discipline. *Id.* (noting that prior admonitions are properly considered in crafting the proper sanction); *Ireland*, 748 N.W.2d at 503 (considering prior public discipline in crafting proper sanction). Prior misconduct is more suggestive of increased sanctions when it involves the same type of conduct as the conduct currently subject to discipline. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cohrt*, 784 N.W.2d 777, 783 (Iowa 2010) ("A prior admonition is properly considered in determining discipline, especially when it involves the same type of conduct as the conduct subject to discipline.").

Here, we note that Baldwin has been subject to discipline on two previous occasions. First, in July 2012, Baldwin was found to have violated rule 32:1.5(a) by charging his client an excessive fee to copy his

file. He was admonished by the Board for this violation. This prior misconduct involved the same type of misconduct present in this case. In both instances, Baldwin failed to provide a client with access to his or her files. Second, in October 2012, we suspended Baldwin's license to practice law in Iowa for failing to respond to an inquiry of the Board. Further, we again note that in this case Baldwin failed to file his answer to the Board's complaint by the deadline and instead filed a request for an extension after the deadline had passed, further demonstrating his inability to meet deadlines. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Frerichs*, 671 N.W.2d 470, 477–78 (Iowa 2003) (considering as aggravating factor attorney's failure to cooperate with the Board).

Finally, Baldwin has presented no evidence of any mitigating factors, other than a somewhat perplexing argument that his neglectful representation of Candace caused her no real harm. We agree with Baldwin that where there is no evidence of harm to a client, a lesser sanction may be appropriate. *See Marks*, 759 N.W.2d at 332 (noting that harm to client warrants a greater sanction). However, we strongly disagree that Baldwin's professional conduct in his representation of Candace caused her no harm. As we understand it, Baldwin argues that because physical care of the children was eventually returned to its original state, the harm that ultimately befell Candace was minimal. This argument completely ignores and minimizes the harm that his ethical violations have caused Candace. To summarize, Baldwin repeatedly neglected his representation of Candace. This neglect resulted in the quashing of subpoenas, which resulted in a judgment for attorney fees against Candace. Baldwin then missed a disclosure deadline resulting in the continuance of her trial and a further judgment of attorney fees against her. Candace then terminated Baldwin and

retained new counsel, but Baldwin refused to return any funds which were due her and refused to provide her files and records to her or her new attorney so he could prepare for the rescheduled trial. We fail to see how there has been no significant harm to Candace. Rather than being a mitigating factor, the harm perpetrated on Candace is an aggravating factor. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dolezal*, 841 N.W.2d 114, 128 (Iowa 2013) (considering as aggravating factor attorney's insistence that he had done nothing wrong, despite obvious ethical misconduct); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Stowers*, 823 N.W.2d 1, 17 (Iowa 2012) ("Minimizing or failing to take responsibility for one's misconduct is an aggravating factor.")

The commission recommends we suspend Baldwin's license indefinitely with no possibility of reinstatement for six months. Having considered the particular circumstances in this case, and after our de novo review of the record, we conclude that the appropriate sanction is a suspension with no possibility of reinstatement for three months.

**V. Conclusion.**

We suspend Baldwin's license to practice law with no possibility of reinstatement for three months from the date of the filing of this opinion. Upon application for reinstatement, Baldwin shall have the burden to show he has not practiced law during the period of suspension and that he meets the requirements of Iowa Court Rule 35.14. Baldwin must notify all clients pursuant to Iowa Court Rule 35.23.

In addition, as a condition to any reinstatement, Baldwin shall satisfy this court that all client property has been returned to Candace, including all her files and records in his possession. Further, Baldwin shall return to Candace the $218 in unearned fees he withdrew from the trust account, but has not yet returned. Finally, Baldwin shall be

required to make restitution to whomever is currently entitled to the $3135.30 in attorney fees assessed against Candace by the court in the modification action.

Costs are taxed to Baldwin pursuant to Iowa Court Rule 35.27.

**LICENSE SUSPENDED.**